UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-540 |
| JAMIL FELDER | : | |

**SURRICK, J.**                                                                                                       **MAY 13, 2008**

**MEMORANDUM**

Defendant Jamil Felder's Motion To Suppress Evidence, (Doc. No. 11), was denied by Order dated May 7, 2008. The Motion was denied for the following reasons.

**I.     BACKGROUND**

On June 5, 2007, Philadelphia Police officers Anthony Comitalo and Mark Klein were on patrol in the 35th Police District, which includes the Logan, Olney and East Oak Lane neighborhoods. (Supp. Hr'g Tr. 6-7, Jan. 14, 2008.) At the time, a drug war was taking place in the area and the Philadelphia Police were patrolling to provide presence and to investigate suspicious activity. (*Id*. at 7.) At approximately 2:00 AM, the officers observed Defendant driving eastbound in the 1500 block of Wingohocking Street in a black Chevrolet Monte Carlo. (*Id*. at 8.) The officers observed that Defendant's vehicle did not display a valid registration sticker. (*Id*.) The officers decided to stop the vehicle for a violation of § 1301 of the Motor Vehicle Code. (*Id*.) Defendant pulled into a Lukoil gas station at the southeast corner of Broad and Wingohocking Streets. *(Id*.) When Defendant stopped his vehicle, it was pulled half way into the gas station parking lot, blocking some of the station's gas pumps. (*Id*.) The officers

pulled their vehicle directly behind Defendant's vehicle. (*Id*.)  In this position they were partially blocking traffic on Broad Street. (*Id*.)

When the officers approached Defendant, he identified himself as Jamil Felder. (*Id*. at 8-9.)  The officers requested Defendant's license, vehicle registration, and proof of insurance. (*Id*. at 9.)  Defendant produced a Pennsylvania identification card, but did not produce a driver's license. (*Id*.)  Defendant also produced a yellow slip of paper with his name on it. (*Id*.)  This yellow slip appeared to be a receipt for the vehicle that Defendant was driving. (*Id*.; Gov't Ex. 6.)  Defendant did not produce a valid registration, or proof of insurance. (Hr'g Tr. 9.)  Defendant told the officers that he had purchased the vehicle at an auction. (*Id*.)  The yellow receipt produced by Defendant indicated that it had been purchased on May 8, 2007. (Gov't Ex. 6.)  The officers then ran Defendant's name, as well as the vehicle identification number of his automobile, through their Mobile Data Terminal. (Hr'g Tr. 11.)  This search revealed that there were two summary failure to appear warrants outstanding for Defendant. (*Id*. at 11-12.)  The computer search also revealed that although Defendant did have a driver's license, Defendant's vehicle did not have a valid registration. (*Id*. at 12.)  Defendant was placed in the back of the police vehicle while the officers prepared a ten day subpoena which addressed the failure to appear warrants. (*Id*. at 18.)  Defendant was not under arrest at this time. (*Id*.)

Because Defendant's vehicle lacked valid registration, the officers implemented the Philadelphia Police Department's "Live Stop" policy. (*Id*.)  The Live Stop policy provides the procedures that officers follow when impounding vehicles. (*See* Gov't Ex. 16.)  These include

instructions governing the initiation and scope of inventory searches.[1]  (*Id*. at 2-3.)  The Live Stop procedure that the officers undertook in this instance was the standard procedure used whenever the stopped a vehicle does not have a valid registration.  (Hr'g Tr. 14-15.)  Officer Comitalo has impounded approximately 100 vehicles in the course of his career using the Live Stop procedure.  (*Id*. at 15.)

In compliance with the Live Stop policy the officers notified the Philadelphia Parking Authority of their intent to impound Defendant's vehicle and requested a tow truck.  (*Id*. at 14.)  The officers completed a required towing form, which instructed them to conduct an inventory search to identify what was in Defendant's vehicle.  (*Id*.)  The officers began an inventory search of Defendant's vehicle after they had requested the tow truck from the Parking Authority, but before the tow truck arrived on the scene.  (*Id*. at 22.)  At times the Parking Authority has only one or two tow trucks on call to respond to Live Stop tow requests.  (*Id*. at 27-28.)  The limited number of Parking Authority tow trucks and the large volume of vehicles being impounded under the Live Stop policy on a typical day sometimes leads to lengthy delays between the time that a tow is requested, and when a tow truck arrives.  (*Id*. at 28.)  Under the PPD's Live Stop policies and procedures, officers begin an inventory search after the required paper work is completed, and while the tow truck is en route.  (Gov't Ex. 16.)  They do this in order to expedite the completion of the Live Stop process so that they can return to service.  (Hr'g Tr. 23.)  Based on "[t]raining on the job" and "experience[]," Philadelphia Police Officers regularly perform

---

[1] The PPD's Live Stop policy provides for the impoundment of a vehicle when: a vehicle is unregistered; a vehicle is operated with a suspended registration; the vehicle's operator is unlicensed; or, the vehicle's operator has a suspended license. (Gov't Ex. 16 at 1; *see also* Hr'g Tr. 13.)

Live Stop inventory searches while they are waiting for the tow truck to arrive. (*Id*.) On the night in question, the officers were particularly eager to complete the Live Stop procedure, because there had been five shootings in the area. (*Id*. at 28.) Two of the shootings had taken place during the time that the officers were impounding Defendant's car. (*Id*.)

In the course of performing an inventory search of Defendant's vehicle, and after doing an inventory of the interior of the vehicle, Officer Comitalo used the keys to open the trunk. (*Id*. at 15-16.) In the trunk, Officer Comitalo saw a grocery bag that had fallen over with its contents spilled out in plain view. (*Id*.) Among the contents of the bag was an off-white chunky substance, approximately eight inches in diameter. (*Id*. at 16.) This substance was in plain view, and Officer Comitalo did not have to move anything to see it. (*Id*.) The white chunky substance was crack cocaine. (*Id*.) Officer Conitalo also saw several small baggies in the trunk near the off-white substance. (*Id*.)

After finding the crack cocaine in the trunk of Defendant's vehicle, Defendant was arrested and the officers decided to secure the vehicle until such time as a search warrant could be obtained. (*Id*. at 23.) The officers then cancelled the tow truck and drove the vehicle to a secure lot at the 35th Police District headquarters. (*Id*. at 17.) From that location a police tow truck towed the vehicle to a different lot where it could be searched once the police obtained a search warrant. (*Id*.) No further search of the vehicle was conducted prior to the search warrant being obtained. (*Id*.) In total, the officers were at the scene of Defendant's initial stop for approximately 45 to 60 minutes. (*Id*. at 23.) During this time, the Parking Authority tow truck did not arrive. (*Id*. at 24.) Defendant was transported to the 35th Police District headquarters and

processed. (*Id*. at 17-18.)[2]

As a result of this incident, Defendant was indicted on one count of possession with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and one count of possession with intent to distribute a controlled substance within 1000 feet of a school, in violation of 21 U.S.C. § 860(a). Defendant filed the instant Motion seeking to suppress all evidence recovered from him and from his vehicle on June 5, 2007. Defendant contends that the initial search of his vehicle was a warrantless investigatory search without probable cause. Defendant contends that the initial discovery of contraband during that search was in violation of his Fourth Amendment rights, and that all evidence subsequently seized is the "fruit of the poisonous tree." (*See* Doc. No. 11; Hr'g Tr. 3-5.)

## II. LEGAL ANALYSIS

The Supreme Court has held that, consistent with the Fourth Amendment, police officers may make a warrantless inventory search of a properly seized vehicle. *South Dakota v. Opperman*, 428 U.S. 364 (1976). Such searches must, however, be "conducted according to standardized criteria or established routine." *Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987); *see also Illinois v. Lafayette,* 462 U.S. 640 (1983). Such a criteria or routine must insure that investigating police officers exercise their discretion "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 375. The requirement of a standardized process is to insure that "police officer[s] . . . not be

---

[2] The Government alleges that after his arrest, Defendant was found in possession of $2,500. (Doc. No. 11 at 3.) The Government further alleges that after obtaining a search warrant, officers searched the vehicle and seized several pieces of evidence suggestive of illegal narcotics trafficking. (*Id*.) Finally, the Government alleges that a subsequent search executed by federal agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives recovered additional contraband. (*Id*.)

allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Florida v. Wells*, 495 U.S. 1, 4 (1990) (quoting *Bertine*, 479 U.S. at 376).

The Third Circuit has addressed inventory searches in the aftermath of *Opperman*, and its progeny. In *United States v. Frank*, 864 F.2d 992 (3d Cir. 1989), the Third Circuit recognized that the routine or criteria for an inventory search need not be in writing to satisfy the Supreme Court's requirement under the *Opperman* line of cases. *Id*. at 1003. Noting that "[t]he evidence established that the police complied with all written and oral procedures and regulations incidental to such searches," the court concluded that the defendant's suppression motion "must be denied." *Id*. at 1000. In analyzing the Supreme Court's pronouncements regarding inventory searches, the Third Circuit noted that "[i]n *Opperman* . . . [t]he opinion does not suggest that the standard police procedures were reflected in a pre-existing formalized policy, written or oral." *Id*. at 1102. The court then upheld the inventory search at issue stating:

> Lieutenant Kowalski [an investigating officer] testified to standard police procedures applicable to impounded vehicles, and Detective Fox [another investigating officer] testified that he followed them. It is true that the Allegheny County Police department had no written procedures governing inventory searches, but Kowalski's testimony set forth unwritten standard procedures, applicable to all impounded vehicles, and according to the evidence, these were complied with.

*Id*. at 1002. Thus, under *Frank*, a police department's policy and procedure need not be formally written so long as it is standardized, consistently applicable in like situations, and complied with by the investigating officer in a particular case.

In *United States v. Salmon*, 944 F.2d 1106 (3d Cir. 1991), the court rejected a municipality's argument that it had seized evidence pursuant to a lawful inventory search on the basis that the established routine at issue did not limit the officer's discretion with regard to the

scope of the search. *Id*. at 1121.  In so doing, the court clarified the importance of the routine or criteria requirement:

> Standardized criteria or an established routine governing inventory searches must limit an officer's discretion in two ways.  First, it must limit the officer's discretion regarding *whether* to search a seized vehicle. . . .  Second, the pre-existing criteria or routine must limit an officer's discretion regarding the *scope* of an inventory search, particularly with respect to the treatment of closed containers.

*Salmon*, 944 F.2d at 1120-21 (citations omitted) (emphasis in original).  Notably, however, the court suggested that these factors could be satisfied by means of a "pre-existing, unwritten policy," thereby reinforcing its holding in *Frank*. *Id*. at 1121 (citing *United States v. Kordosky*, 921 F.2d 722, 723-24 (7th Cir. 1991); *Frank*, 864 F.2d at 1003).

Our analysis of this case begins by examining the nature of the Philadelphia Police Department's "Live Stop" policy, which governs impoundment and inventory searches by Philadelphia Police officers.  Defendant argues that the Department's Live Stop policy prohibits investigating officers from performing their inventory search on an impounded vehicle before the tow truck arrives.  Defendant also argues that if a tow truck does not arrive within thirty minutes the officers must terminate the impoundment process.  Defendant asserts that because the officers did not comply with the written Live Stop Policy, the evidence seized by the officers should be suppressed.

Section 6309.2 of the Pennsylvania Motor Vehicle Code, entitled "Immobilization, towing and storage of vehicle for driving without operating privileges or registration," provides in pertinent part:

> 75 Pa. C.S.A. § 6309.2(a)(2).  If a motor vehicle or combination for which there is no valid registration or for which the registration is suspended, as verified by an appropriate law enforcement officer, is operated on a highway or trafficway of this Commonwealth, the law enforcement officer shall immobilize the vehicle or

combination or, in the interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storage agent pursuant to Subsection (c), and the appropriate judicial authority shall be so notified."

The Philadelphia Police Department has adopted the "Live Stop Program" which is designed to implement § 6309.2. The "Live Stop Program" provides the following procedures when impounding a vehicle:

> III.  Impoundment Procedures
>
>   A.  Once it is determined during the course of a lawful vehicle investigation that the operation is in violation of any provisions identified above, the investigating officer shall:
>
>   1.  Request Police Radio to confirm the status of the operator's license or lack thereof and/or the vehicle's registration.
>
>   NOTE: If the status can not be confirmed, the vehicle shall not be impounded.
>
>   2.  Upon verification, Police Radio will notify the Philadelphia Parking Authority and Philadelphia Traffic Court. A time check will be given by Police Radio upon notification.
>
>   3.  Inform the operator that the vehicle is being impounded by the Philadelphia Traffic Court and explain the reason why.
>
>   4.  Notify the operator and any occupants that they will not be left at that location and that the police department will either transport them to their residence or another address if located within a reasonable distance, to the nearest police district where the individuals can safely make alternate arrangements, or to the nearest public transportation hub, if they so desire. Occupants will also be advised that they have the right to refuse any police services.
>
>   5.  Prepare the traffic citations, a Pedestrian and Vehicle Investigation Report coded 2808 (75-48A) and Towing Report (Form 75-7).
>
>   6.  Prepare a Towed Vehicle Notice (Form 75-618).

    This provides the necessary information and instructions on how the operator or owner can reclaim the vehicle (See Appendix "A").

    7.    If the operator is a scofflaw, or any other warrants exist, normal arrest procedure will be followed.

    8.    Police officers may respond to priority calls without a supervisor's authorization.  Also, officers may leave the scene prior to the arrival of a tow truck if other exigent circumstances develop (i.e., other than a priority call), but only when authorized by a supervisor.  In either case, if an officer does leave the scene prior to the arrival of a tow truck, Police Radio will be notified to cancel the authorized tower.

    NOTE: If an authorized tow truck does not arrive within thirty minutes, the officer will issue the citations, terminate the stop, and advise Police Radio that he or she is back in service.

B.    Once a tow truck arrives on location, the investigating officer shall, with the aid of backup:

    1.    Have the operator and occupants exit the vehicle and remain on location until the tow truck operator has the vehicle in tow.

    2.    Complete the Towing Report by conducting a vehicle inventory describing any damage and/or missing equipment, personal property of value left in the vehicle by the operator/occupants including the trunk area if accessible.

    NOTE: No locked areas, including the trunk area, will be forced open while conducting an inventory.

    3.    At the top of the Towing Report in the "Reason for Towing" block, the "Violation" block will be checked off and the citation number for all tickets to be issued along with the Pennsylvania Code section and fine amounts will be clearly recorded in the "Trunk Locked" block.  The "Location Vehicle Towed" block will be left empty (See Appendix B").

    4.    The Towing Report will be signed by the officer and

>vehicle operator. Ask the operator to sign at the bottom of the "Describe Damage" block. If the operator refuses to sign, it will be noted by the investigating officer on both the Towing Report and the Vehicle and Pedestrian Investigation Report. (See Appendix "B").
>
>5. The tow truck driver will be given the white copy of the Towing Report.
>
>6. The vehicle operator will be given the pink copy of the Towing Report, the "Defendant" copy of all citations prepared, and the Towed Vehicle Notice Form.

(Gov't Ex. 16.)

Section III of the Live Stop policy appears to be written in an attempt to anticipate the sequence of events that will ordinarily take place when police officers impound a vehicle under the Motor Vehicle Code. Section III(A) of the policy states procedures addressing the initial steps to be taken after an officer identifies a vehicle for impoundment. (*Id*. at 2-3.) Section III(B) addresses the procedures to be followed when removing the vehicle from the area. (*See Id*. at 3.) We do not read the "Live Stop" policy to require that the impoundment procedures be accomplished in the order that Defendant suggests. In fact, taken to its logical conclusion, Defendant's argument would require that the operator and occupants of the vehicle to be impounded remain in the vehicle until after the tow truck arrives. Moreover, the officer could not conduct a vehicle inventory describing damage and or missing equipment until after the tow truck arrives. Obviously, such an interpretation defies reason and common sense.

More importantly, Defendant's suggestion that the inventory search cannot take place until the tow truck arrives does nothing to further the two essential functions that an inventory search procedure should perform; limiting police discretion as to whether to search a vehicle, and limiting police discretion as to the scope of the vehicle search. *Salmon*, 944 F.2d at 1120-

21. With regard to the first function, the written policy states that "the investigating officer, shall, with the aid of backup . . . [c]omplete the towing Report by conducting a vehicle inventory . . . ." (*Id.*) The policy unambiguously requires that if a vehicle is impounded, an inventory search of the vehicle shall occur. With regard to the second function, the policy provides the scope of the search to be undertaken by investigating officers, stating that the report will describe "any damage and/or missing equipment, personal property of value left in the vehicle by the operator/occupants including the trunk area if possible." (Gov't Ex. 16 at 3.) The policy further provides that "[n]o locked areas, including the trunk area, will be forced open while conducting an inventory." (*Id.*) Nothing in the policy, or in the evidence before us, suggests that the presence of a tow truck was intended to limit police discretion to conduct a search or limit discretion as to the scope of the search. (*Id.*)

In addition, even if the policy did require, as Defendant argues, that a tow truck arrive before an inventory search is conducted, the evidence before us demonstrates that this policy has been modified to accommodate the practical realities of police work. The Third Circuit's decisions in *Frank* and *Salmon* advise that it is not necessary for the standardized criteria or established routine to be written, merely that it be pre-existing and consistently applied. In this case, the evidence establishes that there is a policy within the Philadelphia Police Department to begin inventories on impounded cars as soon as possible, regardless of whether a tow truck had arrived. Officer Comitalo discussed this policy at the suppression hearing as follows:

> Q. And what was your understanding of the policy and procedure with respect to the inventory search as it relates to the tow truck and the Parking Authority?

11

> A.  Well, I believe that we were able to inventory the vehicle while the tow truck was en route to keep the process moving along after the paperwork was completed.
>
> Q.  And –
>
> A.  So that's what I did. I inventoried the vehicle.
>
> Q.  – what was that belief based upon?
>
> A.  Training on the job, experiences. We were never instructed to await anybody's arrival.
>
> Q.  And that's what you've always done this –
>
> A.  Always, yes.

(Hr'g Tr. 23.) Officer Comitalo further testified that he had performed over one hundred Live Stop procedures in the course of his career and had followed the same procedure each time. (*Id*. at 15.)

The procedure used by Officer Comitalo is simply an oral modification of the written policy, based on the practical realities of implementing the Live Stop policy in Philadelphia. As Officer Comitalo testified, the volume of cars being impounded daily is high, the Philadelphia Parking Authority typically has only one or two tow trucks in operation, and it is therefore not uncommon for officers to have to wait for extended periods of time before a tow truck is available. (*Id*. 27-28.) In light of these facts, in the years since the written Live Stop policy was drafted, the Department has adjusted the policy to permit inventory searches to proceed while awaiting a tow truck's arrival, in order to expedite the Live Stop procedure and thereby return the investigating officers to their regular patrols as quickly as possible. While it might be

advisable for the Department to revise the written Live Stop policy, viewed through a constitutional lens, there is no basis upon which to conclude that the inventory search here was unreasonable and violated Defendant's Fourth Amendment Rights.  The Supreme Court and the Third Circuit have explicitly stated that inventory searches pursuant to unwritten or oral policies are constitutionally permissible so long as the policy is pre-existing and limits the investigating officer's discretion as to the search decision, and scope.  The written policy and the unwritten modification adopted by the Philadelphia Police Department accomplish that goal.

With regard to Defendant's argument that the investigating officers violated the Live Stop procedure by not terminating the impoundment when a tow truck failed to arrive within 30 minutes, Defendant points to the NOTE following Section III(A)(8) of the Live Stop policy. (*See* Hr'g Tr. At 25.)  Section III(A)(8) states that police may leave a Live Stop scene to respond to "priority calls" without a supervisor's authorization but must have authorization to depart if "other exigent circumstances" develop.  (Gov't Ex. 16 at 2-3.)  Section III(A)(8) deals with limited situations in which a Live Stop process may be terminated.  The NOTE appears to require the termination of Live Stop in all circumstances when a tow truck fails to arrive in 30 minutes.  However, as with the question of whether the tow truck must be present before an inventory search can begin, it appears from Officer Comitalo's testimony at the suppression hearing that the policy of the Philadelphia Police Department has evolved based upon the actual circumstances on the street.  The policy now allows officers to continue a Live Stop procedure even if a tow truck has not arrived within 30 minutes.   The testimony of Officer Comitalo explains why this policy adjustment was necessary and why it makes perfect sense:

> the Parking Authority sometimes only has one or two trucks . . . working the city at any period of time. . . . Sometimes it could take up to three hours.  My understanding

> was that at half an hour, we were permitted discretion to stop the Live Stop Process, and this was upon a supervisor's, I guess, approval. But we can wait – we were able to wait longer for the truck if, say, they were backed up that night. They're often backed up. I mean, there are so many vehicles being Live Stopped, there are often, like a wait before the truck ever arrives. So normally Live Stop we give it longer than half an hour for the truck to arrive.

(Hr'g Tr. 27-28.)

As a practical matter, Officer Comitalo could not just terminate the Live Stop and permit Defendant to drive away in a vehicle that had no valid registration. Nor could he simply leave the vehicle in the gas station blocking the gas pumps. Officer Comitalo had little choice but to proceed with the Live Stop procedures in anticipation of the ultimate arrival of the tow truck. Based on the evidence presented at the suppression hearing, it was the practice in the Philadelphia Police Department to permit Live Stop procedures to continue even if a tow truck had not arrived within 30 minutes of the Live Stop being initiated. This is a practice born out of necessity.

In Philadelphia there is clearly a need for police officers to complete inventory and impoundment procedures as quickly as possible so that they can return to service. In this instance, the officers who inventoried and impounded Defendant's car were on patrol in the 35th District because a drug war was taking place in that neighborhood. There had been numerous shootings in recent days. During the time that the officers were performing the Live Stop procedure on Defendant's vehicle, two more shootings occurred in the vicinity. The Live Stop policy, written and oral, permitted the officers to complete the inventory and impoundment procedure more quickly than would have been possible had they been required to wait for the Parking Authority tow truck to arrive before conducting the inventory. Officer Comitalo and Officer Klein acted in good faith in attempting to comply with the Police Department's Live

14

Stop policy as they understood the policy.  The inventory search of the trunk of the Defendant's vehicle was reasonable and complied with the requirements of the Fourth Amendment.  Any evidence later seized as a result of search warrants issued based upon the inventory search of the Defendant's vehicle was not the fruit of the poisonous tree.

Finally, even if one were to conclude that the search conducted by Officer Comitalo violated the Live Stop Policy and was therefore unlawful, suppression of the crack cocaine found in the trunk is not required.  It is beyond dispute that Defendant's automobile lacked proper registration, and that the impoundment of the vehicle was required.  Under the circumstances, an inventory search of the vehicle was going to be conducted and, eventually, the crack cocaine in the trunk was inevitably going to be discovered.  If evidence unlawfully obtained would have been inevitably discovered by lawful means, exclusion of the evidence is not required.  *See Nix v. Williams*, 467 U.S. 431, 443-444 (1984); *see also United States v. Vasquez De Reyes*, 149 F.3d 192, 194-95 (3d Cir. 1998).

In the case of *United States v. Haro-Salcedo*, 107 F.3d 769 (10th Cir.1997), the Tenth Circuit Court of Appeals dealt with a case similar in some respects to this case.  In *Haro-Salcedo,* defendant's vehicle was stopped by local police.  *Id*. at 770.  Since defendant could not show proper ownership and registration the vehicle was impounded.  *Id*.  A DEA agent who had been investigating Defendant for involvement in drug trafficking conducted a warrantless search of defendant's vehicle and discovered cocaine in the trunk.  *Id*.  The search was admittedly an investigatory search and not an inventory search.  *Id*.  The Tenth Circuit concluded that defendant's motion to suppress was properly denied based upon the inevitable discovery rule.  *Id*. at 773-74.  The Court found that even though the search by the DEA agent

was unlawful, defendant's vehicle had been impounded by the local police and police department procedures mandated an inventory search of impounded vehicles.  *Id*.  The Court concluded that since a proper inventory search of the vehicle would have uncovered the cocaine and since an inventory search would have been conducted, the cocaine in the trunk of the vehicle would have been inevitably discovered.  *Id*.

The Government cites the non precedential Third Circuit opinion in *United States v. Morris*, 179 Fed. Appx. 825 (3d Cir. 2006) in support of its position.  Although not controlling, *Morris* is instructive.  In *Morris*, the defendant was arrested and charged with driving under the influence.  *Id*. at 827.  The police officer conducted an inventory search of defendant's automobile in violation of the explicit commands of the police department's established vehicle inventory policy.  *Id*.  Two judges of a three judge panel rejected a challenge to an inventory search even though the search deviated from the department's written policy.  Judge Nygaard found that the police officers had complied with the written policy to the extent that they were able to do so given the circumstances, and that the contraband was therefore lawfully discovered.  *Id*. at 828.  He also concluded that the contraband would have been inevitably discovered in any event.  *Id*. at 828-29.  Judge Smith concurred indicating that if there is a deviation from the written policy the question becomes whether the officers conducting the search acted in good faith in attempting to comply with the policy.  *Id*. at 829-832.  If so, no constitutional violation has occurred.  *Id*.  Judge Smith concluded that the officers had acted in good faith.  *Id*.  Judge Becker in dissent drew a bright line in concluding that if the officers fail to adhere to the written inventory search policy the inventory search is constitutionally invalid.  *Id*. at 831-33.  However, Judge Becker also concluded that the case should be remanded to the district court for

consideration of the inevitable discovery doctrine. *Id.* at 833-34.

We are satisfied that Officers Comitalo and Klein acted in good faith in conducting the inventory search of Defendant's vehicle. We are also satisfied that the evidence seized from Defendant and his vehicle is admissible under the inevitable discovery doctrine. Accordingly, Defendant's motion to suppress was denied.

BY THE COURT:

_____
R. Barclay Surrick, J.